Filed 2/18/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

<table>
<tr><td>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHELLE ABRAHAMIAN,<br><br>    Defendant and Appellant.</td><td>2d Crim. No. B289162<br>(Super. Ct. No. 2014030327)<br>(Ventura County)</td></tr>
</table>

Michelle Abrahamian appeals from the judgment entered after a jury convicted her of knowingly procuring or offering a forged quitclaim deed for recordation in a public office (count 1 - Pen. Code, § 115, subd. (a))[1] and knowingly possessing a false completed notary public's acknowledgment (notary acknowledgment) with intent to defraud (count 4 - §§ 475, subd. (a), 470, subd. (d)). The jury found true an enhancement allegation that the victim's loss exceeded $200,000. (Former § 12022.6, subd. (a)(2).) The jury also found true an "aggravated white collar crime enhancement" allegation that a "pattern of related felony conduct" had resulted in a loss of more than

_____

[1] Unless otherwise specified, all statutory references are to the Penal Code.

$500,000.  (§ 186.11, subds. (a)(1), (a)(2).)  Appellant was sentenced to prison for an aggregate term of seven years, eight months - the two-year middle term on count 1, plus a consecutive eight-month term on count 4, plus two years for the former section 12022.6, subdivision (a)(2) enhancement, plus three years for the aggravated white collar crime enhancement.  Pursuant to section 186.11, subdivision (c), the trial court ordered appellant to pay a fine of $500,000.  Pursuant to section 1202.4, subdivision (f), it ordered her to pay restitution of $189,382 to the victim.

Appellant contends:  (1) the court erroneously admitted evidence of uncharged acts, (2) the evidence is insufficient to support her conviction for possession of a false completed notary acknowledgment with intent to defraud, (3) the court failed to instruct the jury sua sponte on an element of this offense - the false notary acknowledgment must be completed, (4) the evidence is insufficient to support the aggravated white collar crime enhancement, (5) the court erroneously imposed a two-year consecutive term for the former section 12022.6, subdivision (a)(2) enhancement because the statute was repealed before she was sentenced, and (6) the matter must be remanded so that the trial court may conduct a hearing on appellant's ability to pay the $500,000 fine and victim restitution of $189,382.

Because the evidence is insufficient to prove that appellant possessed a *completed* notary acknowledgment, we reverse her conviction on count 4 for possession of a false completed notary acknowledgment with intent to defraud.  (§ 475, subd. (a).)  We also reverse the true finding on the aggravated white collar crime enhancement allegation.  We strike the $500,000 fine imposed pursuant to section 186.11, subdivision (c), and remand the

2

matter to the trial court for resentencing. In all other respects, we affirm.

*Charged Offenses*[2]

Appellant, together with her husband, Patrick Abrahamian (Patrick), and her sister, Taline Indra, were charged in count 1 with procuring or offering for recordation a forged instrument, i.e., a quitclaim deed conveying Thomas Cotton's residence to appellant. (§ 115, subd. (a).) In count 4, appellant alone was charged with possessing false completed notary acknowledgements executed by Indra, a California notary public. (§§ 475, subd. (a), 470, subd. (d).) The notary acknowledgements purported to authenticate Cotton's signature.

Cotton was "having trouble meeting [his] financial obligations." He was behind on the mortgage payments for his residence on Mustang Lane in Bell Canyon (the Mustang residence). He had unsuccessfully sought a loan modification.

Cotton met Patrick through a friend. Patrick said that "he could get [Cotton] a loan modification."

By a lease dated October 1, 2012, Cotton rented the Mustang residence to appellant and Patrick for one year at a monthly rent of $5,000. Patrick agreed that he would work on obtaining a loan modification. Patrick helped Cotton find another place to live while appellant and Patrick were staying at the Mustang residence.

Patrick did not obtain a loan modification for Cotton. After their one-year lease had expired on October 1, 2013, appellant

_____

[2] The facts underlying the charged offenses and the uncharged acts are complex. The summary of the facts comprises 39 pages of appellant's opening brief and 34 pages of respondent's brief. We include only the most salient facts in our summary of the evidence.

3

and Patrick stopped paying rent. They continued to occupy the Mustang residence despite Cotton's demand that they move out.

Cotton learned that on October 8, 2013, a quitclaim deed had been recorded conveying the Mustang residence to appellant. The deed states that the conveyance is a gift so no documentary transfer tax is due. Indra authenticated the grantor's signature on the deed as the signature of Cotton. She declared under penalty of perjury that, on October 3, 2013, Cotton had personally appeared before her and had "proved . . . on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument." Cotton denied signing the deed.

In her notary journal, Indra was required to document the notarization of Cotton's signature. Information was missing from the journal entry for Cotton's signature, including his thumbprint. Heather Tallent, a district attorney investigator who specializes in the investigation of real estate fraud, testified that the notarization of a signature "that affects real property . . . requires a thumbprint."[3] Tallent opined "that a missing thumbprint [in a notary journal] for a real estate document is one indicator of fraud."

Cotton gave appellant and Patrick a three-day notice to pay rent or quit. Appellant filed a verified complaint against Cotton seeking to quiet title to the Mustang residence. She asserted that, pursuant to the quitclaim deed, she was "the fee simple title owner of the . . . property." She claimed that on October 1, 2013,

---

[3] Government Code section 8206, subdivision (a)(2)(G) provides, "If the document to be notarized is a deed, quitclaim deed, deed of trust, or other document affecting real property, . . . the notary public shall require the party signing the document to place his or her right thumbprint in the journal."

4

she and Cotton had "entered into an oral agreement whereby [Cotton] would convey title to [her] in exchange for payments totaling $175,000." She "provided [Cotton] with the sum of $175,000 . . . in return for fee simple title to the . . . property."

On December 3, 2014, investigators from the Ventura County District Attorney's Office searched the Mustang residence and a Ford Raptor pickup truck pursuant to a search warrant. The Raptor was registered in Patrick's name. Investigators stopped the Raptor while appellant was driving it. A manila envelope was on the dashboard. Inside the envelope were seven notary acknowledgments bearing Indra's signature and official notary seal. These acknowledgments are the basis of appellant's conviction for possessing false notary acknowledgments with intent to defraud (count 4). Each acknowledgment purported to authenticate the signature of Thomas Cotton.

In a downstairs office of the Mustang residence, investigators found statements of Cotton's earnings from a company named SCV Construction. Cotton never worked for this company. Investigators also found Bank of America statements in his name. Cotton did not have an account with Bank of America. Cotton's account number was the same as a Bank of America account that Patrick had opened in his own name.

*Uncharged Acts*

Stephen Danel

Danel owned a home in Northridge. In 2012 he started missing mortgage payments, and the lender began foreclosure proceedings. A friend introduced him to Patrick, who identified himself as "Rick Black." Patrick and Danel orally agreed that Patrick would purchase the home for $60,000. Patrick made a down payment of $15,000 and said that he would pay the

5

remaining $45,000 when Danel vacated the property. After Danel moved out, he did not receive the promised $45,000 and was unable to contact Patrick.

Danel never signed any paperwork for the sale of his home. After he had vacated the property, he learned that on June 1, 2012, a quitclaim deed had been recorded conveying the property to Gabriel Abrahamian (Gabriel), Patrick's father. The person who requested the recording asked that the recorded deed be mailed to Gabriel at Patrick's home address. Rita Medvedev, a notary public, verified that the grantor's signature on the deed was the signature of Danel. But Danel neither signed the deed nor appeared before Medvedev. The deed stated that the conveyance "is a bonafide gift."

When district attorney investigators searched appellant's and Patrick's Mustang residence on December 3, 2014, in the master bedroom they seized a desktop computer that contained Bank of America statements in Danel's name. Danel did not have an account with this bank. Danel's account number was the same as a Bank of America account that Patrick had opened in his own name. The computer also contained an earnings statement in Danel's name from SCV Construction. Danel never worked for this company.

It is reasonable to infer that the computer belonged to appellant. The "name of the user account for the . . . computer" was "Michelle," appellant's first name. The "registered owner of the . . . computer" was also "Michelle." The computer contained "an Apple iPhone backup file." The iPhone was named "M. Abrahamian." Kristina Bertilson, a district attorney investigator and expert in conducting examinations of computer files, opined

that the desktop computer had "one user." The computer is hereafter referred to as "appellant's computer."

Gabriel Munoz

Gabriel Munoz owned a home on Bahama Street in North Hills (the Bahama residence). At the time of trial in February 2018, he was 84 years old. He testified through a Spanish interpreter. He was able to read "a little bit" of English.

On October 11, 2013, a quitclaim deed was recorded conveying the Bahama residence to Mikael Puskulian. The deed stated that the conveyance was a gift. Indra notarized Munoz's signature on October 3, 2013, the same date that she notarized Cotton's signature. Indra's notary journal entry for the transaction did not include Munoz's thumbprint and other required information. District Attorney Investigator Tallent opined that, because of the missing information, "the journal is indicative of fraud."

Munoz testified that he did not know anyone named Mikael Puskulian. He did not sign the deed or appear before Indra. He did not request that the deed be prepared.

During the search of the Mustang residence, in the downstairs office investigators found a handwritten note stating: "Need to do a Quitclaim Deed from Gabriel Munoz to: Mikael Puskulian." The note includes an address that matches the address of the Bahama residence.

Appellant's computer contained false documents for Munoz. These included Bank of America statements in Munoz's name. Munoz did not have an account with this bank. Munoz's account number was the same as a Bank of America account that Patrick had opened in his own name. Another false document was an April 2012 earnings statement for Munoz from SCV

7

Construction. Munoz did not work for this company. In April 2012 he "was in the hospital having surgery for cancer." An additional false document was an Internal Revenue Service Form W-2 showing that in 2012 Munoz earned $44,201. Munoz did not work in 2012.

Susan Shepard

In February 2013, a quitclaim deed was recorded conveying from Karl and Susan Shepard to Francisco Guerrero a property in Mojave. The conveyance was a gift. Indra notarized the Shepards' signatures. But Susan Shepard had died twelve years earlier in 2001. In February 2015 a court entered a default judgment in favor of Karl Shepard and against Indra and Guerrero. The judgment decreed that the quitclaim deed is a forgery and therefore void. Inside the manila envelope on the dashboard of the Raptor that appellant had been driving, district attorney investigators found documents pertaining to Karl Shepard's lawsuit, including his request for entry of a default judgment. Karl Shepard did not testify.

Kelly Adcock

A quitclaim deed purported to convey from Kelly Adcock to appellant a property in Chatsworth. The conveyance was a gift. The deed does not show that it was recorded. On May 30, 2014, Indra notarized Adcock's signature. But Indra's notary journal does not include any entry for this transaction. District Attorney Investigator Tallent opined that "it appears . . . that [Adcock] did not appear before the notary because there is no correlating journal entry." Appellant's computer contained Bank of America statements and an earnings statement from SCV Construction in Kelly Adcock's name. Adcock's bank account number was the

8

same as a Bank of America account that Patrick had opened in his own name.  Adcock did not testify.

David Lankford

A quitclaim deed purported to convey from David Lankford to Redouane Zidani a property at 5162 West 142nd Street in the City of Hawthorne.  The conveyance was a gift.  The deed does not show that it was recorded.  On October 1, 2014, Indra notarized Lankford's signature on the deed.  Indra's notary journal includes an entry for the transaction, but the entry is missing required information, including Lankford's thumbprint.

Indra's journal entry is dated the day after Lankford purportedly signed the deed.  Tallent opined, "If [the deed] was, indeed, signed before the notary, the notary would have completed [the journal entry] at the same time on the same date."

A handwritten note inside Indra's "notary journal bag" said, "'Property address is 5162 W'" and "'From David Lan[k]ford going to Red Zidani.'"  Tallent opined, "If this was a legitimate transaction, then the notary wouldn't need to have a note to . . . keep the facts straight on how to convey the property . . . ."

During the execution of the search warrant at the Mustang residence, a district attorney investigator found a copy of Lankford's driver's license.  Below the license is a handwritten note that says, "From David 5162 W. 142nd St[.] Red is receiving."  Lankford did not testify.  At the time of trial, he was deceased.

Michael Jeffries

In May 2015, a grant deed was recorded conveying from Michael Jeffries to Redouane Zidani a property on Whitcomb Avenue in Simi Valley (the Whitcomb property).  The conveyance was a gift.  Indra notarized Jeffries' signature.  Indra's notary

9

journal is missing required information for the transaction, including Jeffries' thumbprint.

Tallent testified: "[I]f Mr. Jeffries had appeared before Ms. Indra to actually notarize a legitimate deed, these [missing] fields [in Indra's notary journal] would presumably be complete . . . ." "[T]he deed was, in my opinion, fraudulently notarized because of that."

The Whitcomb property had belonged to Dana Ashby. Appellant's computer contained Bank of America statements and an earnings statement from SCV Construction in Ashby's name. Ashby's bank account number was the same as a Bank of America account that Patrick had opened in his own name. Neither Jeffries nor Ashby testified.

### *Admissibility of Evidence of Uncharged Acts to Prove Intent and Common Design or Plan*

"'Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition,' such as identity, common plan, or intent. [Citation.] . . . We review the trial court's determination for abuse of discretion, and view the evidence in the light most favorable to the trial court's ruling. [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 711.)

"Cases sometimes describe Evidence Code section 1101(b) evidence as 'prior offenses' or 'prior bad acts.' Both shorthand formulations are imprecise. Evidence Code section 1101(b)

10

authorizes the admission of 'a crime, civil wrong, *or other act*' to prove something other than the defendant's character. (Italics added.)" (*People v. Leon* (2015) 61 Cal.4th 569, 597 (*Leon*).)

"The relevance [of an uncharged act] depends, in part, on whether the act is sufficiently similar to the current charges to support a rational inference of intent, common design, identity, or other material fact. [Citation.] 'The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant "'probably harbor[ed] the same intent in each instance."'" [Citation.] . . . [Citation.]" (*Leon, supra,* 61 Cal.4th at p. 598.)

"A greater degree of similarity is required in order to prove the existence of a common design or plan. . . . [E]vidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).)

*Uncharged Acts Admissible to Prove Intent and Commission of the Charged Offenses Pursuant to a Common Design or Plan*

The trial court instructed the jury that it may consider the uncharged acts for the purpose of establishing identity, intent, motive, absence of mistake or accident, and common design or plan. The instruction is "'presumed correct, and it is the appellant's burden to affirmatively demonstrate error.' [Citation.]" (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549.)

Count 4 charged appellant with knowingly possessing a false completed notary acknowledgment "with intent to defraud."

11

(§ 475, subd. (a).) An intent to defraud is not an element of a violation of Penal Code section 115, subdivision (a), which was charged in count 1. (*People v. Guevara* (2004) 121 Cal.App.4th 17, 25.) For count 1, the mental element is knowledge that the deed was false or forged when appellant procured or offered it for recordation. (§ 115, subd. (a).)[4]

Appellant argues that the uncharged acts were inadmissible to prove her intent because she did not dispute this issue: "[A]ppellant's defense was a denial of the alleged acts. The defense asserted that no one forged Cotton's name and that Cotton did in fact sign the deed . . . . No dispute existed that if appellant caused a false quitclaim deed to be filed and possessed forged notary documents in Cotton's name, she had [the] intent to defraud. Thus, if the acts of forgery did in fact occur, appellant's intent in committing that offense was not reasonably in dispute; the intent was to unlawfully transfer Cotton's property to appellant, plain and simple."

Appellant's intent was disputed. "[A] fact—like defendant's intent—generally becomes 'disputed' when it is raised by a plea of not guilty or a denial of an allegation. (Pen.Code, § 1019 ['The plea of not guilty puts in issue every material allegation of the accusatory pleading, except those allegations regarding previous convictions of the defendant to which an answer is required by [Penal Code] Section 1025'].) Such a fact remains 'disputed' until

---

[4] Section 115, subdivision (a) provides: "Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony."

it is resolved." (*People v. Rowland* (1992) 4 Cal.4th 238, 260, first brackets added, other brackets in original.)

Moreover, appellant's defense placed the intent element in issue. By providing an innocent explanation for Cotton's signature on the quitclaim deed, appellant in effect claimed that she did not intend to defraud Cotton.

In her pretrial motion to exclude evidence of uncharged acts, appellant stated, "She denies the act(s), therefore *inferentially* admitting that if she did it [s]he had the requisite intent." (Italics added.) Appellant did not offer to stipulate that, if Cotton's signature on the quitclaim deed were forged, she had knowledge of the forgery and intended to defraud him. Even if appellant had offered to so stipulate, "[b]ecause we conclude that the disputed evidence was admissible to establish a common design or plan, . . . [her] offer to [so] stipulate [would not have] affect[ed] the admissibility of the evidence." (*Ewoldt*, *supra*, 7 Cal. 4th at p. 406, fn. 7.)

Appellant contends that "[t]he uncharged conduct was inadmissible because it was not sufficiently similar to the charged offense to prove intent." Viewing the evidence in the light most favorable to the trial court's ruling, we conclude that the uncharged conduct was sufficiently similar to prove both intent and common design or plan. "[T]he charged and uncharged acts together suggested a planned course of action rather than a series of spontaneous events." (*Ewoldt*, *supra*, 7 Cal.4th at p. 404.) The charged and uncharged acts showed that appellant, Patrick, and Indra were involved in a scheme to defraud property owners by preparing and recording forged deeds with the owners' signatures notarized by Indra. All of the conveyances were characterized as gifts to avoid documentary

13

transfer tax.  Based on the false Bank of America account statements and SCV Construction earnings statements in the owners' names, it is reasonable to infer, as the People maintain, that there was "a common plan to impersonate the property owners for purposes of obtaining mortgage modifications."

We reject appellant's claim that the uncharged "property transfers . . . failed to sufficiently implicate [her] and therefore were not relevant to prove her intent."  Appellant was linked to the uncharged property transfers through information on her computer, documents in the manila envelope on the dashboard of the Raptor that she had been driving, and documents found during the search of the Mustang residence.  Moreover, Adcock's property on Jordan Avenue in Chatsworth was conveyed directly to appellant.

The charged transfer of the Mustang property involved a conveyance from Cotton to appellant.  Except for Adcock's property, the uncharged transfers involved conveyances to persons other than appellant.  This difference between the charged offense and uncharged acts did not render the uncharged acts inadmissible.  The charged offense and uncharged acts must be "sufficiently similar," not identical, to be admissible to show intent or common scheme or plan.  (See *Ewoldt*, *supra*, 7 Cal.4th at pp. 401-402 ["evidence of a defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan"].)

Adcock, Lankford, Jeffries, and Ashby did not testify.  Appellant claims that the absence of their testimony precludes a finding that the transactions involving them were fraudulent.  The transactions were similar to those involving Cotton, Danel,

14

Munoz, and the Shepards. Cotton, Danel, and Munoz testified that the transfers of their properties were fraudulent. Although the Shepards did not testify, appellant concedes: "[T]he [Shepard] property involved the filing of a fraudulent quitclaim deed." "[T]he default judgment against Indra was . . . strong proof of fraud." Based on the similarity of all of the transactions and other evidence, a jury could reasonably infer that the transactions involving Adcock, Lankford, Jeffries, and Ashby were also fraudulent even though they did not testify. Of particular significance is the absence of required information, including the grantor's thumbprint, in Indra's notary journal. For the Adcock transaction, there is no entry at all in her journal.

The trial court instructed the jury that the uncharged acts may be considered to prove motive and identity. Appellant argues that this instruction was erroneous because motive and identity were not in dispute. Appellant also argues that "the uncharged conduct was . . . insufficiently similar to be admissible" to prove identity. "Evidence of an uncharged crime is relevant to prove identity only if the charged and uncharged offenses display a "'pattern and characteristics . . . so unusual and distinctive as to be like a signature.'" [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 370.)

"[B]ecause evidence of prior conduct may be admitted to prove a defendant's intent and plan, regardless of whether it also is relevant to prove the defendant's [motive or] identity as the perpetrator, we need not decide whether the evidence was admissible to prove [appellant's motive or] identity. Assuming, without deciding, that the jury should not have been instructed that it could consider the evidence to establish [appellant's motive or] identity as the perpetrator, any error in this jury

15

instruction was harmless." (*People v. Foster* (2010) 50 Cal.4th 1301, 1329 (*Foster*).)

Finally, appellant contends that the trial court should have excluded the evidence under Evidence Code section 352. "If evidence of prior conduct is sufficiently similar to the charged crimes to be relevant to prove the defendant's intent, common plan, or identity, the trial court then must consider whether the probative value of the evidence 'is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid.Code, § 352.)' [Citation.]" (*Foster*, *supra*, 50 Cal.4th at p. 1328.) "We review a challenge to a trial court's choice to admit or exclude evidence under section 352 for abuse of discretion. [Citation.] We will reverse only if the court's ruling was 'arbitrary, whimsical, or capricious as a matter of law. [Citation.]' [Citation.]" (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.)

The trial court did not abuse its discretion. "'Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. . . . '"The "prejudice" referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."'" (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.) Here, the prejudice resulting from the admission of the uncharged acts was not undue. Evidence of these acts was highly probative. "The testimony describing [appellant's] uncharged acts . . . was no stronger and no more inflammatory

16

than the testimony concerning the charged offenses.  This circumstance decreased the potential for prejudice, because it was unlikely that the jury disbelieved [Cotton's] testimony regarding the charged offenses but nevertheless convicted [appellant] on the strength of [the] testimony . . . regarding the uncharged offenses, or that the jury's passions were inflamed by the evidence of [appellant's] uncharged offenses." (*Ewoldt, supra,* 7 Cal. 4th at p. 405.)

### *Insufficient Evidence of a False Completed Notary Acknowledgment*

Section 475, subdivision (a) (475(a)) provides:  "Every person who possesses or receives, with the intent to pass or facilitate the passage or utterance of any forged, altered, or counterfeit items, *or completed items contained in subdivision (d) of Section 470* with intent to defraud, knowing the same to be forged, altered, or counterfeit, is guilty of forgery."  (Italics added.)  The statute is divisible into two parts.  "The first portion, 'any forged, altered, or counterfeit items' is one category set apart by the word 'any,' which means no particular limit is placed on the type of forged, altered, or counterfeit items.  [¶]  The second portion, 'completed items contained in subdivision (d) of Section 470,' in its plain meaning, is limited to completed items listed in section 470, subdivision (d)." (*People v. Mutter* (2016) 1 Cal.App.5th 429, 434 (*Mutter*).)

One of the items listed in section 470, subdivision (d), is "the acknowledgment of any notary public."  Appellant was charged with possessing completed notary acknowledgements under the second portion of section 475(a).  She claims that the evidence is insufficient to support her conviction because, as a matter of law, the notary acknowledgments she possessed were

17

incomplete.  Since this is a pure legal question, we exercise our independent judgment.  (*Danser v. Public Employees' Retirement System* (2015) 240 Cal.App.4th 885, 890 ["we exercise independent judgment to address a pure legal question"].)

The violation of section 475(a) is based on appellant's possession of seven notary acknowledgments collectively marked as People's Exhibit 78.  The notary acknowledgments authenticate Cotton's signature, are signed by Indra, and bear her official notary seal.

District attorney investigators found the notary acknowledgments in December 2014 when they searched the Raptor that appellant had been driving.  At that time, former Civil Code section 1189, subdivision (a)(1) set forth the required form for a notary acknowledgment.[5]  Former section 1189, subdivision (a)(1) provided:  "Any certificate of acknowledgment taken within this state shall be in the following form:

State of California        )
County of _____    )

On _____ before me, (here insert name and title of the officer), personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s)

---

[5] Present Civil Code section 1189 requires the same form except that the following new language must appear in an enclosed box at the top of the form, "A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document."  (*Id.*, subd. (a)(3).)

is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)"

As to the seven notary acknowledgments included in People's Exhibit 78, three fully comply with the required form except for the date. On two of these three acknowledgments, the space for the date was left blank. As appendix A to this opinion, we attach a copy of one of these two undated acknowledgments. The third acknowledgment contains the date of June 16, but the year is missing. These three notary acknowledgments were not affixed or attached to a document. The other four notary acknowledgments were affixed to the last page of an unsigned affidavit. They are undated and, although Indra signed them, she did not do so under penalty of perjury as required by Civil Code section 1189. These four undated and unverified notary acknowledgments cannot qualify as "completed items" within the meaning of section 475(a).

We must ascertain whether the three undated but otherwise fully executed, verified notary acknowledgments qualify as "completed items" within the statutory meaning. "In construing . . . any statute, we strive to ascertain and effectuate the Legislature's intent. [Citations.] . . . '[W]e follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law, ""whatever may be thought of the wisdom, expediency, or policy of the act."""' [Citation.] We give the words of the statute '"their usual and ordinary meaning."' [Citation.] . . . 'Interpretations that lead to absurd results or render words surplusage are to be avoided. [Citation.]' [Citation.] 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." [Citation.] "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' [Citation.]"'" (*People v. Loeun* (1997) 17 Cal.4th 1, 8-9.)

The pertinent language of sections 475(a) and 470, subdivision (d) - "completed" notary acknowledgment - is clear and unambiguous. Webster's Third New International Dictionary defines "complete" as "possessing all necessary parts, items, components, or elements: not lacking anything necessary." (Webster's Third New Internat. Dict. (1981) p. 465, col. 1.) Both former and present Civil Code section 1189 make clear that a notary public's certificate of acknowledgment *must* include the date that the person seeking notarization personally appeared before the notary public. The certificate of acknowledgment form begins with the language, "On _____ before me, . . . personally appeared _____ . . . ." (Former Civ. Code, § 1189, subd.

(a)(1), present § 1189, subd. (a)(3).)[6] Thus, as a matter of law, a notary public's certificate of acknowledgment is not a "completed item" within the meaning of section 475(a) if it omits the date that the person seeking notarization appeared before the notary public.

Our interpretation of section 475(a) does not lead to absurd results. The requirement that the certificate of acknowledgment include the date is not a mere formality. The requirement assists in verifying the identity of the person who signed the notarized document. For example, suppose that a notary public's certificate of acknowledgment states that on March 1, 2018, John Smith appeared before the notary in the County of Ventura and proved that he signed the attached document. If John Smith can show that he was not in the County of Ventura on that date, he may be able to prove that he did not sign the document.

Accordingly, appellant's conviction for possessing a completed notary acknowledgment with intent to defraud in violation of section 475(a) must be reversed for insufficiency of the evidence.

---

[6] The requirement of the date is set forth at page 10 of the 2019 Notary Public Handbook, published by the California Secretary of State: "The certificate of acknowledgment must be in the form set forth in Civil Code section 1189. In the certificate of acknowledgment, the notary public certifies: [1] That the signer personally appeared before the notary public *on the date indicated* in the county indicated; [2] To the identity of the signer; and [3] That the signer acknowledged executing the document." (Italics added.) The 2019 Notary Public Handbook appears at https://notary.cdn.sos.ca.gov/forms/notary-handbook-2019.pdf.

*Reduction to Attempted Possession, Vel Non*

At our request the parties have submitted supplemental letter briefs on whether appellant's invalid conviction for a violation of section 475(a) can be reduced to an attempted violation of the statute, i.e., an attempted possession of a completed notary acknowledgment with the intent to defraud.

In *People v. Bailey* (2012) 54 Cal.4th 740 (*Bailey*), our Supreme Court discussed when an appellate court can reduce a conviction of a completed crime to an attempt to commit the crime. The court noted, "We have 'long recognized that under Penal Code sections 1181, subdivision 6, and 1260, an appellate court that finds that insufficient evidence supports the conviction for a greater offense may . . . modify the judgment of conviction to reflect a conviction for a lesser included offense.'" (*Id.* at p. 748, fn. omitted.) For an attempt to qualify as a lesser included offense of the completed crime, the "elements test" must be satisfied. (*Id.* at p. 752.) This "test is satisfied if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, such that all legal elements of the lesser offense are also elements of the greater. [Citation.] In other words, "'[I]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.'"" (*Id.* at p. 748.)

Another test for determining whether an uncharged offense is a lesser included offense is "the 'accusatory pleading' test." (*Bailey*, *supra*, 54 Cal.4th at p. 748.) Under this test, "a lesser offense is included within the greater charged offense if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense." (*Ibid.*) But "the accusatory pleading test only applies in determining whether a defendant

22

received *notice* of the charges against him in order to have a reasonable opportunity to prepare and present his defense." (*Id.* at p. 751.) To reduce the conviction of a completed crime to an attempt to commit that crime, the attempt must still satisfy the elements test. (*Id.* at pp. 751-752.)

The elements of a completed violation of section 475(a) are (1) possession of a *completed* notary acknowledgment, (2) "with the intent to pass or facilitate the passage or utterance" of the acknowledgment, (3) with the intent to defraud, and (4) with knowledge that the acknowledgment is "forged, altered, or counterfeit." (*Ibid.*) An attempt to commit a violation of section 475(a) "requires a specific intent" to commit the crime. (*Bailey, supra*, 54 Cal.4th at p. 749.) "Section 21a states that '[a]n attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.'" (*Ibid.*)

We need not decide whether, under the elements test, an attempt to violate section 475(a) is a lesser included offense of a completed violation of section 475(a). Even if it is a lesser included offense under this test, we cannot reduce appellant's conviction of a violation of section 475(a) to an attempted violation of that section. We cannot do so because the jury was not instructed that the possession of a completed notary acknowledgment is an element of the charged offense. The jury was instructed as follows: "The defendant . . . is charged in Count 4 with possessing or receiving a forge[d] document in violation of Penal Code [s]ection 475, sub[division] (a). To prove that the defendant is guilty of this crime, the People must prove that: One, the defendant possessed a false notary acknowledgment [not a false *completed* notary acknowledgment];

23

two, the defendant knew that the document was forged or false; three, the defendant intended to pass, use, aid the passage or use of the document as genuine; and, four, when the defendant possessed or received the document, she intended to defraud."[7]

An appellate court can reduce a conviction of a completed crime to an attempt to commit that crime only if "the jury, by finding defendant guilty of [the completed crime], . . . impliedly [found] all the elements of the attempt offense." (*Bailey*, *supra*, 54 Cal.4th at p. 752.) Because the jury here was not instructed on the requirement that the notary acknowledgment must be completed, "the jury, by finding defendant guilty of [a violation of section 475(a)], [could] not [have] impliedly [found] all the elements of the attempt offense." (*Ibid*.) In other words, the jury could not have found that appellant had attempted to possess a false *completed* notary acknowledgment. Since an attempt to commit a crime requires "a specific intent to commit the crime" (§ 21a), it follows that an attempt to commit a violation of section 475(a) requires a specific intent to possess a false *completed* notary acknowledgment.

We have attempted to follow the law. But our conclusion gives us some pause. The Legislature has determined that it is a

---

[7] CALCRIM No. 1930, the jury instruction for section 475(a), does not require a finding of "completeness" where, as here, the defendant is charged under the second portion of the statute, which "is limited to [the possession or receipt of] completed items listed in section 470, subdivision (d)." (*Mutter*, *supra*, 1 Cal.App.5th at p. 434; see the discussion of section 475(a), *ante*, at pp. 17-18.) The jury instruction should be modified to rectify this omission.

crime to possess a *completed* but forged notary document, with the criminal intent to use it to obtain title to real property. Paradoxically, possession of a nearly identical document with the same criminal intent is apparently legal. If there is a rationale for this distinction, we have not found it. Section 475(a) is written in a way that seems to preclude application of the general attempt statute. (§ 664.)

Although she was not charged with conspiracy, the record shows that appellant, her husband and her sister were engaged in a criminal scheme to fraudulently acquire title to multiple parcels of real property. There were many victims. As part of the scheme, appellant possessed forged but incomplete notary documents with the intent to use them to further the criminal scheme. This should be a crime. The fact that it is not, means the punishment appellant will receive at resentencing is not commensurate with her culpability.

Possession of even an incomplete forged notary document shows a sophisticated disregard for the laws relating to perjury and strikes at the heart of real property conveyancing in the State of California. We urge the Legislature to revisit this matter and clarify that possession of an incomplete forged notary document with the requisite criminal intent constitutes an attempted violation of section 475(a). (See, e.g., *People v. Wetmore* (1978) 22 Cal.3d 318, 331, citing Witkin, Manual on Appellate Court Opinions (1977) § 88 [suggestions to the Legislature concerning potential change in the law].)

*Aggravated White Collar Crime Enhancement*
*and $500,000 Fine*

The jury found true an aggravated white collar crime enhancement allegation that appellant had "committed two

25

related felonies as set forth in Counts 1 and 4 which resulted in a loss to another person of more than $500,000 within the meaning of Penal Code section 186.11(a)(2)." For this enhancement, the trial court imposed a consecutive three-year term of imprisonment.

Since we must reverse appellant's conviction on count 4 for a violation of section 475(a) and the conviction cannot be reduced to an attempted violation of that section, appellant stands convicted of only one felony, not two related felonies. We therefore must also reverse the true finding on the aggravated white collar crime enhancement.

The $500,000 fine must be stricken. Section 186.11, subdivision (c) authorizes a fine not to exceed $500,000 only when a person has been convicted of two or more related felonies.

*Repeal of Former Section 12022.6*

The jury found true an allegation that appellant "took, damaged or destroyed property of a value exceeding $200,000, within the meaning of Penal Code section 12022.6(a)(2)." The trial court imposed a consecutive two-year term for this enhancement. Appellant was sentenced in March 2018. Pursuant to a sunset clause, section 12022.6 was repealed effective January 1, 2018. (See former § 12022.6, subd. (f).)[8] Because of the repeal, appellant contends that "[t]he true finding

_____

[8] Former section 12022.6, subdivision (f) provided: "It is the intent of the Legislature that the provisions of this section be reviewed within 10 years to consider the effects of inflation on the additional terms imposed. For that reason this section shall remain in effect only until January 1, 2018, and as of that date is repealed unless a later enacted statute, which is enacted before January 1, 2018, deletes or extends that date." (Stats. 2010, ch. 711, § 5.) No such statute was enacted.

on [the] enhancement must . . . be reversed and the resultant two-year term must be stricken as unauthorized."

The only published opinion on this issue is *People v. Shiga* (2019) 34 Cal.App.5th 466, 470-471: "Shiga contends . . . the enhancement the trial court imposed . . . under former section 12022.6, subdivision (a)(4), for causing damage in excess of $ 3.2 million, must be stricken because the enhancement  was repealed by its own terms, effective January 1, 2018.  (Former § 12022.6, subd. (f).)  We reject this contention because the repeal of former section 12022.6 does not apply retroactively."  The excerpt from *Shiga* appears in the opinion's introduction.  The portion of the opinion discussing the issue in depth was not certified for publication.

The controlling authority is *In re Pedro T.* (1994) 8 Cal.4th 1041.  There, a minor was found to have unlawfully taken and driven a vehicle under an amendment to Vehicle Code section 10851, which increased the maximum punishment from three to four years.  The amendment had a sunset clause.  The minor "committed [the offense] during the effective period of the provision for increased punishment, but [the judgment] . . . was not yet final as of the 'sunset' date of that provision . . . ."  (*Id.* at p. 1043.)  The minor was committed to the California Youth Authority for the maximum term of four years.

The Supreme Court concluded that "the provision for enhanced penalties shall apply to all vehicle thefts committed during its stated effective period."  (*In re Pedro T., supra,* 8 Cal.4th at p. 1048.)  The court reasoned:  "Ordinarily when an amendment lessens the punishment for a crime, one may reasonably infer the Legislature has determined imposition of a lesser punishment on offenders thereafter will sufficiently serve

the public interest.[9]  In the case of a 'sunset' provision attached to a temporary enhancement of penalty, the same inference cannot so readily be drawn."  (*Id*. at p. 1045.)  "[T]he very nature of a sunset clause, as an experiment in enhanced penalties, establishes—in the absence of evidence of a contrary legislative purpose—a legislative intent the enhanced punishment apply to offenses committed throughout its effective period."  (*Id*. at p. 1049.)

Appellant has failed to show that, when the sunset provision of section 12022.6 was enacted, the Legislature did not intend to apply the provision's enhanced punishment to offenses committed throughout its effective period.  (See *In re Pedro T.*, *supra*, 8 Cal.4th at p. 1048 ["It is axiomatic that in assessing the import of a statute, we must concern ourselves with the Legislature's purpose at the time of the enactment"].)  The trial court therefore did not err in imposing a two-year consecutive term for the enhancement.  (See *People v. Enlow* (1998) 64 Cal.App.4th 850, 858 ["applying the reasoning of *Pedro T.*, we conclude that since Penal Code section 666.5 . . . provides for a period of increased penalties and contains a sunset clause, the legislative intent was that persons such as Enlow who committed

_____

9 See *In re Estrada* (1965) 63 Cal.2d 740, 745:  "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act.  It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply."

28

his crime during the experimental period of increased penalties are to be punished pursuant to the increased penalties," even though their sentences were not final when the sunset clause took effect].)

*Ability to Pay Victim Restitution*

In a supplemental brief, appellant argues that, pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157, "this Court should remand this case to the trial court for a determination on appellant's ability to pay . . . the $189,382 in victim restitution imposed under section 1202.4 subdivision (f)."

Appellant forfeited the ability to pay issue because she failed to raise it in the trial court. (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1155; *People v. Avila* (2009) 46 Cal.4th 680, 728-729; *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.) Even if appellant had not forfeited the issue, *Dueñas* does not apply to victim restitution under section 1202.4, subdivision (f). (See *People v. Evans* (2019) 39 Cal.App.5th 771, 777 ["Based on the significant differences in purpose and effect between victim restitution and the moneys at issue in *Dueñas*, we decline to extend the rule of *Dueñas* to victim restitution"].)

*Disposition*

The conviction on count 4 for possession of a false completed notary acknowledgment with intent to defraud (§ 475(a)) is reversed for insufficiency of the evidence. The true finding on the aggravated white collar crime enhancement allegation (§ 186.11, subds. (a)(1), (a)(2)) is also reversed. The $500,000 fine imposed pursuant to section 186.11, subdivision (c), is stricken. The matter is remanded to the trial court for resentencing. In all other respects, the judgment is affirmed.

After resentencing, the trial court shall prepare an amended abstract of judgment and send a certified copy to the Department of Corrections and Rehabilitation.

CERTIFIED FOR PUBLICATION.


YEGAN, Acting P. J.


We concur:


PERREN, J.


TANGEMAN, J.

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

On_____

Before me, Taline Indra          a Notary Public in an for said State,   personally appeared

_____Thomas   Cotton_____

who proved to me on the basis of  satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.


WITNESS my hand and official seal

Signature___Taline Indra_____

TALINE INDRA
Commission # 1936226
Notary Public - California
Los Angeles County
My Comm. Expires May 19, 2015

(This area for official notarial seal)

APPENDIX A

31

Michael Lief, Judge

Superior Court County of Ventura

_____

Kelly C. Martin, under appointment by the Court of Appeal for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen, Supervising Deputy Attorney General, Theresa A. Patterson, Deputy Attorney General, for Plaintiff and Respondent.